Good morning, Your Honors, and Mr. Stifler. I'm Carolyn Chapman, and I represent the appellant, James Wallace, who is the plaintiff below. I'd like to reserve five minutes for rebuttal. Watch your clock, and you may do so. This case comes to this Court pursuant to Title 38 U.S.C. 4301 through 4323. And how does one pronounce the acronym, USERA?  USERA, okay. Thank you. And do you wish a brief recitation of the facts? No. I think we've all read the briefs. Mr. Wallace has asked for a de novo review based on the fact that, as a matter of law, the trial court found that the jury verdict should be reversed. And under de novo review, I'd like to discuss – Did you – I do have a question, though, at the outset. Yes. This comes up on summary judgment. But the – as I understand, this issue went to – went solely on the issue of the – let me – there were two summary judgments in this case, were there not? There was a limitation on summary judgment. No, Your Honor. This case went to trial. The jury awarded my client $256,800. Okay. And – But there was a summary judgment in this case, an order at some point in this case. Was there not? There was a motion for a summary judgment. It was denied in part and granted in part. What – ultimately, what it is is that USERA is the only remedy. Once your client alleges that there was any discrimination or any acts by the employer based on his military status, then USERA wipes out and usurps any other actions such as negligence, infliction of emotional distress, constructive discharge, retaliation. It's the only cause of action that you can have. Right. But at some point, the district court denied a motion for summary judgment, correct? Correct. And – but – and found that some of these disciplinary actions created – I think there were seven that were referred to, five or seven that were referred to, created there were triable issues of fact. But as I understand, what went to the jury was simply the issue of constructive discharge. No. No. No. Okay. This is why when – it's like we're sort of arguing two parallel universes here. The trial was all about USERA. And I laid out – Well, I'm not saying it wasn't all about USERA. The question is what went to the jury. Did they look to see – did they look at all of the various incidents of discipline that he was claiming all the way back in, what, 1987? Or was there some time limit put on it? Or did they simply look to see whether or not the circumstances at the end were sufficient to constitute constructive discharge? That's a good question. I was trying to get a good question out of all of that. I finally hope I landed one. What I did as the trial attorney, because being a musician, I'm used to just everything in real. So I started out with a chart so that the jury could see exactly the whole history of Mr. Wallace's relationship with the San Diego Police Department from the time that he was hired back in, I think it was 1975. And he had served in the Gulf War. And after he served in the Gulf War and came back, he was not promoted. And he began to see that he wasn't going to get promoted as long as he stayed as a reservist. And so after four years of being on the lieutenant's list, he gave up with that. And he then concentrated on doing more active duty. He would go to Korea three weeks every summer. And then I tried to show the jury that when he came back, see, one of the benefits of USERA is that you're supposed to be placed right back in the position that you were in. I understand all that. What I'm trying to understand is this case, I misspoke when I said summary judgment. It comes up on JNOV, I understand. But there was this summary judgment. I'm trying to understand what went to the jury. And then how much of all of these events went to the jury? And then what was the focus of the JNOV? Because this all seems at the end in the JNOV to be focused on constructive discharge. It was a surprise to me because I never argued constructive discharge. And we didn't put any evidence on to say that he was constructively discharged. They did. I don't think Mr. Stifler would disagree with me in that we could pretty well agree that San Diego Police Department and the city of San Diego did violate the benefits and the rights that Mr. Wallace was entitled to. And then the question is, well, what damages? He has a remedy. The court can either force them to hire him. Well, he had already come back, and they were trying to terminate him. USERA prevents them from bringing termination action for a year. And they moved to terminate him because he didn't report to work. Well, under USERA, he had 14 days where he couldn't he didn't have to tell them, 14 days, not tell them, he didn't have to reapply for employment because he was employed by the U.S. Navy, not the city of San Diego at that time. So it was all about USERA. And what happened is that you get to the issue of damages. Okay, well, the judge would not allow me to put in evidence on mental stress because he said, well, that's really a state action that goes under intentional infliction of mental distress. And the court said that, well, I'm going to interpret USERA very narrowly. But the case law says USERA should be interpreted very broadly. So when I had left for damages, and maybe it was my fault, I should have said and pointed the jury to, okay, he wasn't allowed to teach anymore. And he wasn't allowed to teach at the academy and the college for extra money because Lieutenant Guevara had written disciplinary actions against him for not showing up to work, which was basically absolutely related to being in the military. So he lost those benefits, and he lost money there. He lost money on the 40-hour suspension, which to this day is still a violation of USERA because Chief Armstead stated that he was upholding the 40-hour suspension because he failed to call in and tell his employer he was returning. I understand the court recognized that there were some elements of damages, some elements of USERA violations. But as I understand, looking at the $256,000 jury verdict, the inference was that the jury had to conclude that he had suffered damages by loss of his employment. And the only way that you get to that, as I understand, I could be off, but the only way you get to that is that, in effect, what happened was constructive discharge by a series of retaliatory disciplinary actions. And yet the last segment of Mr. Wallace's career was in the North Division, where he wanted to be, everything was going along fine, and then this woman comes in and says she's going to file a complaint against him if he doesn't back up her racial discrimination complaint, and he walks off the job. So how do they get to $256,000 of damages without looking at the totality of all these and concluding that somehow the USERA violations had to have caused him to walk off the job? On pages 738 through 744 of the transcript, the jury came back with a question regarding damages. And the Court itself said, and this is on page 739, line 25, I can certainly understand the confusion of the jury on the question of damages. The only evidence on the record for the question of damages was what we put in. And again, I think it's sort of my hypothesis. I thought, well, this would be an easier way to measure these damages for emotional distress and hostile work environment, not being able to teach, but just to look at what he lost by leaving early. That was the only evidence. Mr. Stifler and the city did not put any on any rebuttal evidence. Oh, well, he only lost 40 hours. He only lost this or that. The jury had nothing else to go by, and they asked for further instructions. And the Court wouldn't give further instructions. Let's suppose that you put on all of this evidence. And let's suppose that the jury came back and said, well, we don't think that there was any retaliation by the San Diego Police Department except for one incident four or five years ago that resulted in an adverse, resulted in a letter being put in his file. Now, let's suppose that the jury specifically said that that was retaliation, that was a violation of USERRA. What's the measure of damages for that? Well, that's what I think this case is all about. Okay. But it couldn't be $256,000, could it? It depends on how you interpret USERRA as to what you see. USERRA is not specific on damages except for compensatory examinations. Now, in that situation, it would be very small damages. Right. So it couldn't be $256,000. No, no. The district court then had some reason to think that if we've got a measure of $256,000 in damages, which apparently, at least according to the city, is the measure of damages that would correspond to all of his past benefits if him leaving the job or if him losing the job was a direct result of the violation of USERRA. The district court then had reason to say it looked like the jury could only have found that it was constructive discharge because the measure of damages doesn't line up in any other way. I disagree with that because there was nothing else on the record to lead the jury as far as determining what the damages could be. Well, that sounds like you've thrown all your eggs in one basket. It sounds like if the only damages are either $256,000 or nothing or some kind of minimal damages, then you have to have a theory that will sustain $256,000. And that doesn't sound like a theory that would allow a jury to say, well, there was one little incident of retaliation and it wasn't terribly significant, but that was it. Well, there were a lot of incidents, as I mentioned. Oh, I understand. I understand you have lots of incidents that you're trying to string together. But in order to get to that measure of damages, the district court said that it didn't think you could get to that measure of damages unless you had shown constructive discharge. I understand the district court's thinking, but the jury also had a question which leads you to believe that the district agreed with Mr. Wallace, that they were looking for the amount of damages to give him, but there was nothing else on the record. And as far as answering the question about everything being hunky-dory when he goes back to the Northern Division, it wasn't. You have to remember that he had served a 40-hour suspension. He had a five-year tail, and they didn't sanitize anything in his personnel file. That personnel file was at least about 12 inches thick. They didn't sanitize anything. They didn't take out anything, all the stuff that they had written, which a lot of it was pretty bad stuff, and it just wasn't sustained. And before he got there, Guevara and Myers went over to his new command and talked with Ramirez and Swinger and said, well, here's Mr. Wallace coming in. We've had a lot of problems with him, and this is what's happening. And so Mr. Wallace gets there in July. In August, Lieutenant Guevara goes over to Northern from Eastern and brings with him an unacceptable performance report again, serves him with that, and puts him on a 90-day supervised report, personnel report that he's got for 90 days, and they're going to write him up again to see how he's doing. So your argument is then you've got enough evidence to support constructive discharge. Absolutely. Okay. Even though you didn't argue it. Absolutely. Because I don't see where that was where the jury came from based on the questions they had. Now, you said you put all this in, as I understood it, your chart or graph with all of the damages, and I understood you to say that included emotional distress and the like, but is that correct? Yes. Didn't the court grant summary judgment dismissing the emotional distress claims? Yes, but when I started to put on the testimony about how he felt and how it was affecting his life, we had a sidebar, and the court specifically said, and I do have the transcript page, I have to look through my notes here, but the court specifically said, well, I'm going to interpret you, Sarah, very narrowly, maybe I shouldn't, and I'm not going to let you get into this because it was how you could name your damages. I just felt that this was the best measure of the overall damages that he suffered. So is it your position that emotional distress is or isn't a USERA? I think it is because one of the benefits of USERA is that you do not have a hostile work environment, and if you're suffering emotional distress from a hostile work environment, you should be able to be compensated for it. All right. And so part of your claim that you presented was a hostile work environment concept, which may have led to his walking off the job. Yes, sir. Okay. And. . . All right. You may want to save the rest of your time for. . . Thank you. Good morning. Good morning. It pleases this honorable court. I'm Mark Stiffler, representing Kelly, defendant below, city of San Diego. At the outset, I'd like to say this case clearly is about constructive discharge. That's the law that was given to the jury. The jury instructions we agreed on specifically set out constructive discharge. When you look at the record and the arguments of counsel in this case, it focused on constructive discharge. To prevail in this case. . . In those terms? In other words, as constructive discharge? Yes. Where are they? Excerpts of record, which is number 14, shows jury instruction number 13. Jury instruction 13? Right. Actual constructive termination of the claim. To prevail in their lawsuit, Mr. Wallace had to prove that the city retaliated against him because of the exercise of his rights under these errors. That was the sole cause of action that was presented. The others were either dismissed under judgment or dismissed in pre-trial proceedings. At trial, Mr. Wallace presented as his adverse actions basically seven actions that he said would support this retaliation claim. Five of those actions came well before he asserted a right under USERRA. Of course, in the traditional retaliation paradigm, you can't have an adverse action preceding a protected activity. That wouldn't be retaliation. Of course, it has to follow. The five actions he complained of that occurred before April 4, 2000 don't even fit into the retaliation picture. Nevertheless, considerable time has been at trial. I want to make sure I understand you, counsel. You're saying that these acts occurred before he invoked his rights under USERRA? Correct. Okay. But that would be a little different than saying, wait a minute. I tell you that I'm going to the Gulf War, and you do something to frustrate my career path here because you don't like the fact that I'm taking time off to go to the war. I'm going and doing my reserve duty. You're saying that he cannot invoke that under USERRA until he formally says to them, you violated my USERRA rights? The district court pointed that out in their order. One thing they could have done and they didn't was proceed on a discrimination claim. For discrimination, they could have showed that he was just treated unfavorably because of his military status. But they didn't. They chose only to proceed under retaliation theory. And that sets in line that chain of events. So you're saying that under retaliation theory that the only way that you can retaliate is if somebody has formally invoked USERRA? In other words, are you saying that they can't be retaliating if they don't know he is invoking USERRA rights? I believe that would be a correct interpretation of USERRA. Well, but why is that? Why does it have to be labeled as such? I think that's why everybody and I are sharing the same concern. Maybe if we get outside of USERRA. Let's look at Title VII discrimination cases and retaliation. If someone files an EEO complaint and two weeks later their boss fires them, there's an inference, okay, there's a protected activity. Here's the adverse action. That's the causal connection. It was done because of that. But what if evidence is put on the boss didn't know anything about the EEO complaint that was filed? No, but let's suppose to make it parallel, let's suppose the boss knew that the person had gone to complain to somebody. He didn't know it was an EEO complaint. He just knew that this person had gone off to tell some outside agency. In this case, they knew that this guy had gone off to the Gulf War. He had engaged in the kind of conduct which is protected. I think that's the distinction that I would draw. Remember, USERRA is totally designed towards re-employment rights, coming back. And Appellant got this idea mixed up, too. The idea you're bringing up, Your Honor, is going over to war. And USERRA is all about coming back. The protections that are offered there are salary, pension rights, friends' benefits, transfers. Basically, you're supposed to be kept in the same position. But there's no rights in USERRA, and it's not designed towards leaving. In fact, a very curious point here is under 4312A1, the Appellant, as the person in the military, has the obligation before he leaves to notify in writing or orally the employer that he was going. And he didn't even do that. That's where the whole little contest they got into. Unfortunately, it was almost a power struggle between him and the West. I want to make clear on this. Let's suppose that he gives them notice that he's going to be gone, that he's been ordered to show up in Bosnia. And he's going to be gone for three to six months. He'll be back as quickly as he can. He comes back, and they give him a really unfavorable assignment. And he says, well, why not? I've always been a model employee. And they say, well, because we don't like the fact that you weren't around doing the job when everybody else was here 24-7 for the last six months. He says, hey, wait a minute. I don't think you can do that. And they say, well, you haven't invoked USERRA. So this can't be retaliation for you having gone to the war. That doesn't make any sense, does it? But you brought up a very good point, Your Honor. When you look at most of the USERRA cases, most if not all, that's exactly the sort of situation they're dealing with. Somebody comes back, and they get an unfortunate transfer, something they don't like. They lose their job, or they're sent out to Timbuktu. In this case, the ironic thing is the city was requesting that he come back. They were going to give him the exact same job, the exact same responsibility, with the exact same pay. The only dispute was no one understood at the time, not Mr. Wallace, not the representative he saw at the Department of Labor. They didn't understand the period of time he had in which to request his reemployment rights. And under USERRA, as you know, there's basically three different time patterns. One under 30 days, the other 30 days up to half a year, and the other for over that. And depending on the time you were gone, unbroken service. And again, this case got confusing because Mr. Wallace did have breaks in service. So he would look at it and say, well, he's gone for a year. Yeah, but you came back on September 28th, and your new orders weren't until October 4th under the standards, under the law. That's a break in service. So the city wanted him back. They were ignorant of the fact that he had rights to postpone that for 14 days. And the record shows that Captain Myers, as soon as she knew that, she extended Wallace's leave until that point. When Wallace returned, he said, I want to return on April 14th. They said, no, you have to return immediately. Report to work immediately. When he sent in the letter that invoked USERRA, they then got together with the city attorney, with their legal representative, and discussed this. And they talked to the Department of Labor, Mr. Wallace's boss. They said, okay, here's the deal. Initially, they were told he does have to return immediately. They looked at the law. Cheryl Myers, his captain, said, okay, you can now return April 17th. She gave Mr. Wallace more time than he'd initially requested. Then he came and said, well, actually, I want the whole month. But that was a dispute after the invocation of USERRA. That was just a dispute over the interpretation of USERRA at that point. But it wasn't invoked until April 4th. And your earlier question having to do with, well, what about knowledge? It's probably a good theoretical question, maybe in another USERRA case. But I think in this case, it really wouldn't be as pertinent. Because even appellant has agreed. He invoked that right, his right under USERRA, on April 4th of 2000. So that is really the demarcation point for this case. Before that, he was written up for a failure to report for duty. That had nothing to do with USERRA. He could have been an employee of COSCA, an employee of Kmart. It didn't matter that he worked for the military. They say, look, you have a job with San Diego police. You need to be back here on this date. Well, I'm a little fuzzy now on what you're coming back to the question we had before, which is you're saying he could have been employed by COSCA. If he wasn't, he was employed by the military. They knew why he was absent, correct? Right. So they knew. So the only argument that you are, as I understand you to make, is that they didn't realize that USERRA protected that right until he told them it did. Is that right? On April 4th? Right. Okay. So you're saying that unless the serviceman tells the employer that he's entitled to be off, even though he's told them why he's off, that there's no USERRA liability? Right. That's your position? Yes. Okay. Well, that doesn't seem to make a lot of sense under USERRA. In other words, the employer's got to be charged with knowing what the law is. It isn't up to the employee to advise them. They have Family Medical Leave Act rights, and somebody walks in and says, I'm invoking my right under Family Medical Leave Act, and the employer doesn't. It doesn't. The employer's liability doesn't turn on whether or not they happen to know. They're the employer charged with knowing the law, aren't they? Right. And I agree. I think that's a confusing point, and I've looked back and forth. I think in the context, though, of the retaliation paradigm, Your Honor, where he has to be able to show that his exercise of a right was what prompted the city to take the action. And if the city doesn't know about that right, well, they know. All right. Okay. I think we've got that point. Assuming that there are, as the district court found, some incidents post your bright line date where they, in fact, did take action against him, and that a jury could reasonably have found that those were retaliation, would that be what is subject of a new trial on damages limited to any consequences that flow from that misconduct? That point of the district court's order concerned me, too. And I think I was initially confused when I read it, and I went back and looked. And what the court was referring to was they're saying, okay, constructive termination, that doesn't measure it. There's no intolerable conditions. But potentially, they could have, a reasonable jury could have found that the 40-day suspension. Four-day suspension. Right. Or, I mean, the 40 hours and the disciplinary order. I think what the court, in its opinion, neglected to do was to look at the evidence that was presented with that. Again, his exercise of rights was exercised on April 4th. The notes of termination was issued to him on April 1st. So that's, I mean, that's a jury issue. Well. We have to look at all the evidence most favorable to the plaintiff in this case. Right. He got the verdict. Right. But he also got a verdict on constructive termination. Well, right. And then, but as the court said, if I, if it's against the weight of the evidence, then my backup appellate court, then at least it goes to a new trial. It has to be retried. Right. I mean, if I make an error of law here in my JNOV, I'm saying, okay, but at least the evidence doesn't support $256,000. Maybe something less than that. Right. Under Section 4323, the only thing they're allowed to argue or to obtain would be economic damages. So if he was to have been awarded damages for his four-day suspension, it would have been an award of approximately $1,000. But in looking at the reasonableness, could a reasonable jury have determined that that four-day suspension was retaliatory? I would say no. Because the action, again, occurred. April 1st, he was served with the notice of termination. He invoked his rights on April 4th. Now, the other key thing. And then what happened? When did the suspension get imposed? Why did it? When? It's Excerpt 15, June 27th. Okay. So that was after. So the jury could have found that now they knew and they still would have had, they may have cut it down. Instead of termination, they gave him. Yeah. Again. You shake your head. I mean, yes. I mean, that's the posture of this. They got the verdict. So the question is, what does the evidence sustain? It may not sustain 256,000 if that's all that's at issue. That is the 40-day suspension. Okay. But it was Chief Armstead who upheld that four-day suspension. And her memo is Excerpt 15. And, again, that was written on June 27th. So several months after, he had his appeal, and this was reduced down to a four-day suspension. She tossed out all the stuff that had to do with failure to report. And she realized, well, look, you can't report for duty here if you're overseas serving in the military. And, again, I think what happened was the supervisors were dinging him for failing to notify them that they couldn't report. It just wasn't real artfully. Well, that's for the jury to decide. That's a good jury argument. Well, I mean, ultimately, maybe yes. The chief still could look. If she's an independent arbiter, I think, again, when we look at the ambit of Title VII cases, when you have an independent person who's imposing the punishment and they never ascribe any retaliatory motive to Chief Armstead. Now, maybe ipso facto, it doesn't insulate the city from liability, but certainly the fact that a chief at an appeal hearing took out all the stuff he didn't like, essentially, and just said, you know, you're a supervisor in the military, supervisor of the police. You should have notified, and I'm dinging you because of that. So it had nothing to do with his military service. It had to do with the fact that he didn't notify his employer of why he couldn't come back into work. Okay. Thank you. Okay. Thank you. Any questions? You okay? Okay. USERRA usurps any of the local rules or the police department procedures. And Mr. Wallace had between 14 and 90 days, depending on his length of service, to tell them whether he was or was not coming back. So he was still disciplined for failure to tell them immediately before that 14-day period it was up, and that's why he got his 40-hour suspension. And that's a violation of USERRA. And that's Armstead's final order on that. You told us at the outset, though, that you weren't arguing constructive discharge. What did the jury instruction have to do with the case, then? It was for the issue of damages. Isn't that what we're talking about here? Right. Isn't that what we're talking about? Right. It was how do we measure damages. And USERRA is not real clear on exactly what damages are available because with the hostile work environment, you've got emotional distress, mental distress. When he's getting written up and served all these papers from the time August 4th on, because he didn't call them or tell them he was not coming back when USERRA protected him from that. He had 14 days, and he did it within 14 days. But they kept giving more discipline and more discipline, and when he got back. Counsel, that we understand. I'm trying to understand your theory of damages in this case. You revert to this bundle of money saying, well, that seemed the easiest way to present it. There's still a causation element in damages. You've got to attribute damages to what USERRA is protecting. You told us you weren't relying on constructive discharge, and yet the jury was instructed that was an element of the damage calculation or factor, and as was hostile environment. So what is it? I was not relying on it. You weren't relying on it, but the jury was. But I used it as a measure of damages. Does that make sense what I did? And the alternative, I think that there was more than sufficient evidence that going to Northern, he didn't have three months of freedom and peace and quiet. He had this big black cloud over him that was still there, and you can believe me that those Guevara and Myers were not going to let up on him. They don't like losing, and for the police department to say we don't know what the law is, therefore we couldn't have discriminated, we couldn't have retaliated, and they did all this, and they're saying they don't know what the law is, and they enforced the law. I just think it's... Well, in defense of the San Diego Police Department, they don't defend USERRA. This is not something that they're ordinarily charged with defending. Well, they've had Mr. Wallace going in and out since 1974 on leave with the military, and USERRA was the VVRA first, and then USERRA came in in 1994. It had been on the books for six years, and he always filled out his leave, as he said, so that the personnel department would know not to pay him, and part of it was he got 30 days' pay from the police department and the military, the first 30 days he was out, and I think that there were those in the police department who didn't like it over these long years of 20 years of doing that, that he basically got to double dip, and they didn't care for that, and Guevara wrote on one of the documents that he did the discipline on that, well, this makes scheduling very hard, and it's very inconvenient for the police department to try and schedule and do what we have to do because he's gone all the time. Did you plead this as a retaliation and deliberately not include discrimination? No. USERRA itself is discrimination, and so we had discussed discrimination and retaliation. Was there any jury instruction relating to discrimination as opposed to retaliation? You know, off the top of my head, I don't recall. I know we went over them, and I had suggested quite a few, and I had actually suggested a special jury verdict, and the judge rejected that. The district court on its summary judgment motion, when going through some of those incidents, made the observation that what you had proved was discrimination and not retaliation. Do you remember the summary judgment doing that? He drew some consequence from that. I'm sorry. I did not understand your question. The district court noted in saying you had created a triable issue of fact on these prior incidents, but that a group of them appeared to be discrimination and not retaliation. I think that there's both that was going on with the police department. Part of it was discrimination, and part of it was retaliation, and then it just got down by this August 2nd. Actually, Mr. Wallace put up with things, and they got along well until Lieutenant Guevara became his supervising commander and started on the 4th writing the disciplinary that he did not show up to work, and he was over in Bosnia. Okay. And it just went downhill from there. Okay. Thank you very much, Your Honor. Thank you both. The case just argued will be submitted. Okay to keep going? I'm going to keep going. All right. The next case on calendar then is in ComNet versus one of these big creditors' committees, post-confirmation committee of unsecured creditors.
judges: Browning, Fisher, Bybee